STEVEN G. KALAR
Federal Public Defender
Northern District of California
CANDIS MITCHELL
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:  (415) 436-7700
Facsimile:  (415) 436-7706
Email:  Candis_Mitchell@fd.org

Counsel for Defendant Shiferaw

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **United States of America,**<br><br>    Plaintiff,<br><br>    v.<br><br>**Michael Shiferaw,**<br><br>    Defendant. | **Case No.:** CR 18–600 WHA<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**Court:**  Courtroom 12, 19th Floor<br>**Hearing Date:**  December 3, 2019<br>**Hearing Time:**  2:00 p.m. |

## INTRODUCTION

Defendant Michael Shiferaw requests a sentence of 24 months custody. His request represents a variance from the Sentencing Guidelines, but remains appropriate in light of Mr. Shiferaw's lack of prior criminal history, little likelihood of reoffending, eventual deportation, and circumstances surrounding his initial involvement in the offense. While the Court could easily look at Mr. Shiferaw's case and whole-heartedly reject his requested sentence as too far from the recommended sentencing range—a closer examination of Mr. Shiferaw begs a different outcome. Additional time in custody would be unnecessary and unwarranted in this case—especially considering that the seven months that he has spent in pre-sentence custody for this case is already the longest period of time that Mr. Shiferaw has ever spent in custody.

## FACTORS TO BE CONSIDERED IN THE IMPOSITION OF A SENTENCE

The proposed sentence of 24 months' imprisonment is reasonable. In determining an appropriate sentence, the Court must look to the factors set forth in 18 U.S.C. § 3553(a), among them the applicable Sentencing Guideline calculation. *United States v. Booker*, 543 U.S. 220, 245-46 (2005); *United States v. Autery*, 555 F.3d 864, 872 (9th Cir. 2009); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). While the Court must remain mindful of the Sentencing Guideline recommendation, that is only one of the applicable factors; the Guideline range is not presumptively reasonable and it cannot be given any more or less weight than any other factor listed in section 3553(a). *Autery*, 555 F.3d at 872; *Carty*, 520 F.3d at 988, 991. The Court's paramount concern must be to impose a sentence "sufficient, but not greater than necessary" to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520 F.3d at 991. In this case, a sentence of 24 months' imprisonment is more than sufficient to achieve the goals of sentencing.

**1. The Nature and Circumstances of the Offense**

Michael Shiferaw's offense conduct occurred under the press of three related psychiatric disorders. The first is a longstanding depressive disorder, which he has suffered since childhood; the

second and third are the combined effects of his Substance Use Disorders[1] and his Gambling Disorder.[2] The combination of these depressive, substance use and gambling disorders, occurring at a time of relational losses for him, radically altered his judgment and led to him engaging in the charged offense conduct.

### 1.1. Count 2

On November 23, 2018, Mr. Michael Shiferaw entered a Citibank bank branch located at 2198 Chestnut Street in San Francisco, California. At the time he entered the bank, he was months behind on his rent—having spent the majority of his money on alcohol, drugs, and gambling. He was at a loss as to how to make himself whole and was in desperate need of funds. Once inside, he showed the bank teller Ms. Meron Siferaw—his co-defendant and sister—his iPhone. After presenting himself to her and glancing at his phone, she took an unusually large quantity of cash from her cash drawer and placed it into a white plastic bag. In total, she placed $21,100 into his bag. Mr. Shiferaw later left the bank with the bag of money.

Ms. Shiferaw and her bank personal later contacted law enforcement. When questioned about the circumstances of the robbery, she informed them that she did not know who the robber was and she did not identify her brother as the robber. This was ultimately shown to be false and later investigation revealed that the pair had worked together to perpetuate a ruse to commit bank larceny.

Mr. Shiferaw was later arrested at his apartment for his role in the offense. At the time he was arrested, drugs were found inside and outside of his residence. Living with Hinok Atebeha at the time, Mr. Atebeha was later charged with Possession with Intent to Distribute Cocaine. *See United States v. Hinok Atebeha*, 19CR00441-WHA.

### 1.2. Count 3

While on pretrial release, Mr. Shiferaw continued drinking and struggling with gambling. On March 20, 2019, he woke up at the halfway house and left to go to work. After he realized he did not

---

[1] Substance use disorders (SUDs), as described in DSM-V, are part of a class of disorders (substance-related disorders) that are "related to the taking of a drug of abuse (including alcohol)"

[2] Gambling Use Disorders is comprised of persistent and recurrent problematic gambling behavior leading to clinically significant impairment or distress. Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (section 312.31).

have work that day, he went to his apartment and began drinking. While he was drinking, he received a phone call and learned that a friend had passed away. Intoxicated and feeling despondent, Mr. Shiferaw decided to once again rob another bank. He walked to the bank that was closest to him at the Bank of America at 5500 Geary Boulevard in the Richmond District in San Francisco.

At the time Mr. Shiferaw entered into the bank, he was wearing a hat and sunglasses and he appeared to be speaking on a phone. He approached two tellers and requested that they hand over the cash in their cash drawer. For his efforts he received $4,102.00. He left without violence.

**2. The History and Characteristics of the Defendant**

Michael Shiferaw was born on February 19, 1990, in Addis Ababa, Ethiopia to the marital union of his parents; his father, Asfaw Alemu, and his mother, Abaynesh Eshete. His father presently resides in Oakland and his mother splits her time between Ethiopia and Oakland.

While he was growing up, his father used to work for the Ethiopian government, while his mother ran a small coffee shop. He has an older half-sister in Ethiopia from his mother's previous marriage as well as two full sisters who live with his parents in Oakland—Mekdelawit Shiferaw, 30, and Meron Shiferaw, 22. The latter worked as a teller at the San Francisco Citibank branch Mr. Shiferaw robbed and cooperated in the robbery.

Mr. Shiferaw suffered from a lung problem that resulted in severe coughing in the first few years of his life, which necessitated his grandmother and aunt moving in with the family to care for him. His family members describe him at that time as "constantly in pain, coughing, throwing up, and nauseous." *See* Exhibit A at 2. During this time, he would have to spend most of his times indoors or hospitalized. He was "was not allowed to go outside to play with other children as the family feared he would contract an infection." *Id.* During this time, "Michael tried to keep a happy face, if only to cheer up those around him." *Id.*

When he was younger, his father Asfaw lived with the family and was a "violet, angry man." *Id.* His father was a daily abuser of khat.[3] After chewing khat during the day, his father would then

---

[3] Khat is a stimulant drug that comes from a shrub that grows in East Africa and southern Arabia. Like chewing tobacco, leaves of the khat shrub are chewed and held in the cheek to release their chemicals. Cathinone and cathine are the stimulants in khat that make a person feel high like they are on methamphetamine.

DEFENDANT'S SENTENCING MEMORANDUM
*SHIFERAW*, CR 18–600 WHA

4

starting drinking in the evening to counteract the stimulating effects of khat. *See* Exhibit A. This combination produced a volatile emotional climate in his home because his father's drinking lead to his father's violent treatment of his mother and emotional abusiveness toward the children. He would come home drunk at night begin physically abusing people.

His father's abuse focused mainly on his mother, who was physically beaten by him several times per month, but he also regularly beat Mr. Shiferaw, his sisters, his aunt and household help with a belt—occasionally leaving welts and bruises. *See* Exhibit A at 3. Mr. Shiferaw would try to protect his mother however, "due to his sickness and smaller stature, Michael could not stand up to his father and protect his mother." *Id.*

The emotional and verbal abuse his father meted out to him was as bad as the physical abuse. His father "would strike Michael for seemingly insignificant issues, like not clearing his plate properly." *Id.* He said his father would become impatient with him while helping him with homework and pinch him on his leg, often leaving bruises. He estimated that this happened at a frequency of every other day throughout his childhood.

> As his aunt noted:
> The abuse suffered at the hands of Michael's father was an almost nightly event, usually perpetrated when Asfaw would return home from a bar where he had been drinking. As Yeshihareg recalls, the family stayed awake until whatever abuse had ended, as they did not feel safe enough to go to sleep until Asfaw was asleep himself. As a result, the children often went to school having slept only a few hours.

*Id.*

Despite the abuse, he was a good student and had friends, but he frequently got into fights at school. While at school he had temper problems—an argument would turn into a physical fight and his mom would be called. His mother kept these incidents from his father, fearing his reaction would lead to Michael getting a severe beating. The family moved to a different house and neighborhood, initially when an uncle Mr. Shiferaw was close to died while in the house, and again when he was 11 years old, which somehow coincided with an increase in his father's drinking and violent behavior. The move was a residential upgrade, but strained the family's finances such that Mr. Shiferaw was given little in the way of spending money for incidentals, clothing, and supplies.

He graduated from high school and attended Adama University, studying engineering. He had

hoped that the when the family moved to the United States, it would change their circumstances. As his aunt recalled:

> In 2003, Yeshihareg moved to the United States to join her husband, Yohannes. Soon after, the rest of the family won a diversity lottery ticket which allowed them to immigrate to the US. When Michael called Yeshihareg to tell her the news, he was overjoyed. He told her this was the family's ticket out, and that living in the US would finally allow Michael's mother to leave his father.
>
> However, upon arriving in the US, Michael's mother did not leave Asfaw. Michael was very resentful of this fact and began to isolate himself from the family.

*Id.*

The family moved to Oakland when he was 21, one year shy of his graduating with an engineering degree. The plan was for him to finish college here, but, having become used to the government-financed education in Ethiopia, they could not afford the tuition cost in America, so he got a job as a barista in a coffee shop, Working Girls, in downtown San Francisco.

His family lived in a one-bedroom apartment, and when Mr. Shiferaw stayed with them, he was sleeping on the couch in the living room. While there, his father used to intentionally mess with him by staying up watching television in the living room until 1 a.m., even though Mr. Shiferaw had to awaken at 5 a.m. to go to work.

Their relationship eventually completely ruptured about seven years ago with an angry incident, in which his father smelled marijuana smoke on his clothes one night, rousted Mr. Shiferaw from sleep, spit in his face and told him to leave the apartment.

Mr. Shiferaw left, moving to an SRO hotel in the south of Market neighborhood in San Francisco. He saw his father one time in this seven-year period, running into him while his father was jogging around Lake Merritt. According to Mr. Shiferaw, his father came up to him and said, "All the curses I have said to you, I wish they now become true."

After living away from his family at 22 years old and living in San Francisco, Mr. Shiferaw continued working at the Working Girls coffee shop, and then got a job at Denhart's Market, a liquor and convenience store in the Richmond District of San Francisco. He moved to a friend's house in Colma, living in a basement apartment for nine months, and then got an apartment on 11th Avenue in the Richmond District, which he shared with his then-girlfriend, Claudia. She developed a problem

with substances and her family intervened, moving her back to Italy after she lost 50 pounds in three months. Mr. Shiferaw kept their apartment and found himself alone and still estranged from his father. He did not see his mother or aunt, fearing that going to see them would result in him running into his father and having another bad interaction with him. During this time, he was drinking heavily and also using methamphetamine—discussed in more detail below.

Disconnected from his family, not in a relationship, and substantially impaired by substance use, Mr. Shiferaw discovered gambling, almost by accident. He bumped into a friend at a bar one night, who took him to a casino. He lost $100 on this first excursion; they returned the next night and he lost a small amount of money again. On his third trip to the casino, he won $4000. He described the effect this first win had on him as follows:

> That's where life completely changed. I'd spend the money I got every day, getting paid in cash from the liquor store and going to the casino, I'd lose all my money. I couldn't stop. I have this personality where, if I like it, I'm always doing it, whether it's drugs or alcohol or gambling. I told the casino security guards to ban me, which you can do, ban yourself for a year or for life. But I went back within two days in glasses and a hat, back to the blackjack table. They discovered me and kicked me out. I went to another casino in Colma, where I played every day for two years.
> My luck was bad. I can't stop, that's my problem. I'd stay there and sometimes win $3000, then lose it all. Gambling is the worst thing I ever did in my life. I've been addicted to a lot of things, but the gambling was different . . . I don't think I gambled to win money, because I'd win and could have cashed out my $7000 winnings, but I would just keep gambling and would lose it all.

His gambling had a disastrous impact on his finances. He gambled every day for two years, spending all the money he made from his job at Denhart's Market, eventually falling five months behind on his rent. Under this financial stress and with his judgment impaired by daily substance use, he engaged in the offense conduct.

**Drug and Alcohol History**

Mr. Shiferaw used to have considerable antipathy for drinking alcohol because of problems related to his father's drinking, so he avoided drinking himself during his adolescence. He started smoking marijuana when he was 14—smoking daily with a Jamaican friend. He would smoke before school, during the morning break at school, during lunch break, and again during the afternoon break. At home, he would smoke at night, once his parents had gone to bed. During this time, he estimated that he probably smoked five-to-six joints per day. He somehow was able to maintain his

school performance, even with this considerable marijuana use.

When he went to college, he began drinking alcohol. His alcohol use increased when he began living independently from his family in the Bay Area. At the time of his offense conduct, he was drinking a fifth of liquor per night.

He discovered methamphetamine a few years ago and used that daily until his initial arrest on the instant offense. At the height of his meth use, he spent all of his disposable income on methamphetamine, as well as on gambling.

**Gambling History**

Mr. Shiferaw's Gambling Disorder is a substantial causative factor in the offense conduct. When he speaks of gambling, he does so in terms similar to an alcoholic describing his first drink. Regarding the first time he won at blackjack a few years ago, he said, as quoted above, "That's where life completely changed." Playing blackjack, roulette and other games of chance at casinos completely dominated his life from that point forward.

Mr. Shiferaw was paid in cash daily at Denhart's Market and he would promptly lose that money in the casino, causing him to fall behind on his rent. When speaking about gambling, he offered that while it felt good to win, it felt better to keep playing, "the suspense of it, the intensity of when the dealer pulls the card out." When he did win, he would continue gambling until he lost everything. When speaking about how it felt to lose, he said, "Honestly, it didn't feel that bad, because I just thought 'What can I do to make this work?'" His comments reinforce the compulsive that guided his actions and explained why he continued to gamble even after he lost. The DSM-V describes this tendency to "chase one's losses" as follows:

> A pattern of "chasing one's loses" may develop, with an urgent need to keep gambling to undo a loss or series of losses . . . Although many gamblers may "chase" for shorter periods of time, it is the frequent, and often long-term, "chase" that is characteristic of gambling disorder.

Consistent with this clinical description of the compulsively addictive quality of gambling, Mr. Shiferaw banned himself from his first casino in an attempt to prevent his access to gambling, only to go back in disguise a few days later. When this was discovered and he was ejected from that casino, he simply went down the road in Colma to a different casino. Even while he was in the Halfway House, he continued gambling through sports betting and online. Under these conditions, with his finances

continuing to deteriorate with back rent on his apartment piling up, he engaged in the second episode of offense conduct.

**Psychiatric History**

Mr. Shiferaw's exposure to psychiatric intervention was limited to one visit with a psychiatrist at the beginning of this year. At the time, he sought this meeting voluntarily because he felt depressed. This psychiatrist recommended antidepressant medication, but Mr. Shiferaw feared he might abuse this prescription, not knowing that these pharmaceuticals did not get one high as did the other drugs he was using. Nevertheless, he felt helped by talking about his emotional life. This surprised him, as he stated he was raised in a cultural setting where talking about one's feelings is seen as a sign of weakness.

Despite Mr. Shiferaw's actions, his family and community members remain supportive of him. *See* Exhibit B at 4-27. They write repeatedly of his support that he gave during difficult times in their lives, *see id.* at 6, 8, 11; his continued involvement in his community, *see id.* at 7, 10, 19, 23; and, his other admirable traits. *See id.* at 12, 24, 25. They are prepared to support him after he leaves custody and are ready to provide him with the assistance he needed to.

As his aunt noted in her letter:
> Michael used to give the money to poor people that his mom and dad gave him for taxi in order to go to school and he was walking on foot to school. And also he gave his school lunch to poor people that sit and beg at the entrance of his school. When we went back to Ethiopia four years ago, he gave away his savings and cloths to poor people and returned to the United States with nothing.
>
> When my husband and I visited Michael m prison he bowed his head with shame and looked at me while crying. He expressed remorse and took responsibility for his action. Michael also expressed that he learned a big time lesson from his mistake and promised never ever to do again. He also told me that he will always abide by the law when he will be released and pursue a peaceful life.

*Id.* at 22.

3. **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense; to Afford Adequate Deterrence; and, the Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant**

All of these goals would be achieved by the requested sentence of 24 months. The proposed sentence would adequately reflect the seriousness of this offense—an offense for which Mr. Shiferaw

has accepted responsibility. It also would deter him from committing future crimes and protect the public: he will be incarcerated for a lengthy period and then be facing deportation afterwards.

An extended period of incarceration beyond 24 months is unnecessary to deter future criminal conduct. Mr. Shiferaw, who is approaching 29-years-old, has had an awakening. He has grown significantly over the few months months and now recognizes that he needs to break free from his past, the shadow of his father, and to live a law-abiding life so that he may fully grow into the man— that he wishes to become.

**4. The Need for the Sentence Imposed to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

While in custody, Mr. Shiferaw plans to avail himself of the Residential Drug Treatment Program and vocational training. To complete those goals, he seeks placement in facilities near to his family that offer his vocational programs.

**5. The Kinds of Sentence Available**

Here, the Court may impose any sentence up to 20 years' imprisonment, three years' supervised release, a $250,000 fine, and a $100 special assessment per count. Anticipated restitution is $25,202.

**6. Mr. Shiferaw's Proposed Sentencing Range as Set Forth in the Guidelines**

<u>Count 2</u>
Base Offense Level, USSG § 2B1.1 .................................................................... 7
Loss Amount ($21,100), USSG § 2B1.1(b)(1)(C) ......................................... +4

<u>Count 3</u>
Base Offense Level, USSG § 2B3.1 ................................................................... 20
Financial Institution, , USSG § 2B3.1 ............................................................. +2
Threat of Gun, USSG § 2B3.1(b)(2)(F) ........................................................... +2

Acceptance of Responsibility, USSG § 3E1.1(a) & (b) ................................ −3
Total Offense Level ........................................................................................... 21

Criminal History Category .............................................................................. I
Sentencing Guideline Range ....................................................... 37-46 months

Government/Probation Officer Recommendation ......................... 42 months
Mr. Shiferaw's Recommendation ..................................................... 24 months

The Pre-Sentence Report recommends not applying a three-level reduction for acceptance of responsibility. PSR ¶21. Both the government and Mr. Shiferaw believe that the departure is applicable.

Under U.S.S.G. § 3E1.1, a defendant is entitled for acceptance of responsibility if they can "clearly demonstrates acceptance of responsibility for his offense" and if "the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." U.S.S.G. § 3E1.1. Mr. Shiferaw did both in this case. As indicated by his statements in the PSR, he readily admitted his involvement in the offense and apologized for his actions and how it affected others like his family and his sister. PSR ¶ 20. He additionally plead guilty prior to the parties having to substantively make preparations for trial. Accordingly, despite his commission of another offense while his initial case was pending, Mr. Shiferaw was honest about his actions and timely in making statements of admission.

7. **Any Pertinent Policy Statement**

Addressed above.

8. **Unwarranted Sentencing Disparity**

Mr. Shiferaw's sentence of 24 months would not result in unwarranted sentencing disparity between him and other similarly situated individuals in the district.

9. **Restitution**

Mr. Shifreaw should pay restitution to Citibank, 2198 Chestnut Street, San Francisco, California 94123 for $21,100.00 **jointly and severely** with his co-defendant sister. He should **solely** pay restitution to Bank of America, 5500 Geary Boulevard, San Francisco, California 94121 for $4,102.00.

CONCLUSION

Having meaningfully reflected on his life, Mr. Shiferaw now sees the relationship between his upbringing, his addictions, and his commission of the instant offense more clearly than he ever has before. More than can possibly be expressed to the Court, he deeply desires a far better future for

himself, and is eager to change and move forward positively with his life.

And yet, at the same time, Mr. Shiferaw is exceedingly contrite and is prepared to accept whatever punishment this Court may impose at his sentencing. He understands that he must serve a considerable prison sentence and then, both while in custody and thereafter, finally abandon his past in order to have any hope of building a brighter future for himself and becoming an engaged, contributing member of society.

Although he understands and accepts that he must first serve a term of incarceration, he respectfully requests that this Court sentence him to 24 months in custody, a sentence that adequately balances the necessity of meting out sufficient punishment for the instant offense, while also simultaneously accounting for the myriad countervailing sentencing objections and considerations provided for in 18 U.S.C. § 3553(a).

Dated:    November 26, 2019          Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender
Northern District of California

          /S
CANDIS MITCHELL
Assistant Federal Public Defender